**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DRAKE JAMES LEORIS JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-CV-02575 |
| | ) | |
| CHICAGO TITLE LAND TRUST | ) | Judge John J. Tharp, Jr. |
| COMPANY and JEAN M. LEORIS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a suit between co-beneficiaries of an Illinois land trust. Plaintiff Drake James Leoris, Jr. ("Jim") brought this action to invalidate the assignment by his father ("Drake") of his beneficial interest in the land trust to Drake's wife, Defendant Jean M. Leoris ("Jean").[1] In the alternative, Jim sought an accounting to determine the amount of Jean's unpaid contribution to the trust property expenses (Count II). Jean countersued, seeking a declaration on the validity of her assignment (Count I) and damages for Jim's conversion of the trust property (Count II).

Both parties moved for summary judgment on the question of whether Jean's assignment was valid. This Court found that genuine disputes of material fact regarding the alleged coercion and incapacity of Drake precluded judgment as a matter of law. *Leoris v. Chi. Title Land Tr. Co.*, No. 18-CV-02575, 2021 WL 5505540, at *9 (N.D. Ill. Nov. 24, 2021). Thereafter, Jim abandoned his invalidity claim, and the parties proceeded to trial on their accounting and conversion claims.

On February 22, 2023, this Court held a one-day bench trial and heard testimony from Jim and Jean. The chief issue at trial centered on what agreements Jim and Jean had with Drake

---

[1] To avoid confusion arising from their common last name, this opinion refers to the various members of the Leoris family by their first names.

and how those agreements altered both Jim's obligation to share trust property profits and Jean's duty to contribute to trust property expenses.

In accordance with Federal Rule of Civil Procedure 52(a), this Court sets forth its findings of fact and conclusions of law.

## FINDINGS OF FACT

In 1977, Drake created a land trust to purchase the property in question—a two-story building located at 622 Laurel Avenue in Highland Park, Illinois. The Trust Agreement, No. 50677T, named Drake as the sole beneficiary and First National Bank of Skokie as the trustee. Subsequently, Chicago Title Land Trust Company became, and remains, the successor trustee.[2]

The first floor of the building consists of commercial office space. The second floor consists of two residential apartments of equal size. At all times relevant, the second-floor residential apartments were leased, generating rental income. The first-floor commercial office space was not leased. Drake, who was a licensed attorney and real estate broker, operated a law firm (Leoris & Cohen, P.C., a sole proprietorship) and a real estate business (Suburban America Realty, Ltd.) out of the commercial office space. In 1987, Jim took over Leoris & Cohen, becoming the law firm's sole shareholder (a status he still retains). To this day, Leoris & Cohen continues to use the building's commercial office space. It has never paid rent.

In 1993, the land trust property appraised at a market value of $500,000. Also in 1993, Drake secured a $350,000 installment note with a mortgage against the trust property and used the loan proceeds to pay off large federal tax delinquencies. The trust property was mortgaged a

---

[2] Chicago Title Land Trust Company is a nominal defendant and has been joined for the sole purpose of aiding in the recovery of relief. *See* Mem. Op. & Order 3, ECF No. 13. Chicago Title Land Trust Company has not appeared.

second time in 1997 to secure an additional $200,000 installment note. Drake again used the proceeds to pay down tax obligations. By 1997, however, Drake had no credit; thus, Jim signed on behalf of Leoris & Cohen as the borrower for Drake's second loan.

Although Drake was the sole recipient of the proceeds from both loans, he did not personally contribute to any of the mortgage payments. Instead, Jim assumed that responsibility. In fact, throughout the late 1990s, Jim helped his father with numerous financial obligations. In Jim's forthright view, Drake was fiscally irresponsible, and Drake's financial troubles extended well beyond the Internal Revenue Service to many other facets of his life.

Drake ultimately acknowledged that Jim was paying most, if not all, of the trust property expenses (including the two mortgage payments). In recognition of this, and in exchange for Jim's undertaking to continue paying the trust property expenses, Drake agreed to amend the trust agreement to name himself and Jim as joint tenants with the right of survivorship to the land trust's undivided beneficial interest. Accordingly, on September 16, 1998, Drake lodged an assignment with the trustee naming Jim as a beneficiary in joint tenancy. Compl. Ex. B, ECF No. 1. The assignment included the power of direction, obligating the trustee to act, as provided in the Trust Agreement, "upon the written direction of Drake Leoris and Drake James Leoris, Jr." *Id*. Drake was seventy-seven years old at the time.

Two years earlier, Drake had married Jean. This was Drake's second marriage. His first wife (Jim's mother) had passed away in 1981. Jean and Drake lived together in a home in Kenosha County, Wisconsin. Jean was approximately 32 years old when she married Drake.[3]

At some point, Drake borrowed $250,000 from an individual named Mark Carter (Drake's son-in-law, the husband of one of Drake's daughters from his first marriage) and had

---

[3] Jean graduated high school in 1982 and married Drake in 1996.

not repaid him. Mr. Carter eventually sued Drake to collect the debt and won a judgment in the amount of $568,200. Then in 2006, Mr. Carter recorded a judgment lien against the deed of Jean and Drake's Kenosha home. Two years later, Drake turned to Jean for support, asking for $258,000 to help satisfy his judgment debt to Carter.

Jean agreed under one condition. The amount Drake was asking for would have essentially exhausted Jean's personal savings, and so in exchange for her help, Jean asked for some form of financial security in return. Drake acquiesced. And so, in 2008, Jean paid Drake $258,000 in exchange for an assignment of Drake's interest in the land trust. Consequently, Jean and Jim became cotenants in common with equal shares of the land trust's beneficial interest.

Jim learned of Jean's assignment shortly after Drake executed it. He understood that the assignment, if valid, would extinguish his right of survivorship to the trust property given that the assignment severed his joint tenancy with Drake and replaced it with a co-tenancy with Jean, who was significantly younger than Drake. He also—according to his testimony at trial— considered retention of his right of survivorship an essential component of the bargain he made in 1998 with Drake. In other words, Jim claims he agreed in 1998 to pay all the trust property expenses only because of Drake's promise that he would become the land trust's sole beneficiary upon Drake's passing. Given this, Drake broke his promise to Jim by executing the assignment to Jean. Still, because Jim believed that Jean's assignment was invalid, Jim continued upholding his side of the bargain (*i.e.*, he continued paying all of the trust property expenses).

Jim's belief that Drake's assignment to Jean was invalid was rooted in two ideas. First, Jim believed Drake was legally prohibited from assigning any interest to Jean without Jim's consent because, at that time, Jim and Drake jointly held the land trust's power of direction. Second, Jim believed Jean's assignment was void because Jean coerced Drake into executing it,

or because Drake no longer had capacity to assign, or both. Jim's coercion theory was based in part on alleged conversations he and Drake had after Jean's assignment; Jim's incapacity theory was based in part on an alleged cognitive impairment that Jim claimed resulted from a craniotomy (which Drake underwent three years prior to executing Jean's assignment) and from Drake's advanced age.

The Court rejected Jim's first theory on summary judgment. *See Leoris*, 2021 WL 5505540, at *5–6. His second theory survived summary judgment, but Jim abandoned it prior to trial. *See* Pl.'s Trial Br. 2–3, ECF No. 93. Nevertheless, during the relevant time period preceding this lawsuit, Jim's belief (misguided or otherwise) in the invalidity of Jean's assignment at least partially explains his continued payment of the trust property expenses despite the ostensible loss of his right of survivorship.

Jim's payment of the trust property expenses was not the only thing that continued unaffected by Drake's assignment to Jean. Indeed, neither the management nor the use of the trust property changed following the swap in the land trust's beneficiaries: Drake continued using the trust property's commercial office space to operate his real estate business; Jim continued using the same to operate Leoris & Cohen; and both Drake and Jim continued splitting the rent collected from leasing the trust property's two residential apartments. Jean was aware of all this, but took no issue with it. For her part, Jean acknowledged that Drake and Jim had a prior agreement and wanted to respect it. She also had no use for the property—to her, her beneficial interest served solely as a real estate-backed financial investment. Accordingly, following the 2008 assignment, Jean did not use or attempt to use the trust property for any purpose, did not contribute or attempt to contribute to any of the expenses Jim continued to pay, did not involve herself or attempt to involve herself in any management decision regarding the trust property,

5

and did not demand remittance of her fifty percent share of the trust property rents or object to Drake's continued receipt of those rents. This remained the norm until 2017.

On October 6, 2017, Drake passed away at ninety-six years of age. On October 31, 2017, Jean demanded from Jim her share of trust property's rents. This demand, made by her attorney via letter, was the first time since her assignment in 2008 that Jean asserted any claim based on her beneficial interest in the land trust. Jim refused her demand and, in early 2018, filed this suit seeking to have Drake's assignment to Jean declared invalid.

In December 2017, the 1977 land trust agreement—by its own terms—expired. (It originally carried a twenty-year term, but Drake extended it in 1997 for another twenty years.) Jim filed this suit in March 2018. A month later, Jim directed the trustee to extend the term of the land trust by an additional twenty years. However, by way of their respective assignments, Jim and Jean jointly hold the land trust's power of direction, and Jean—who seeks, among other relief, partition of the property—has not joined in Jim's extension direction. Consequently, the trustee has not executed it.

Before concluding, it is important to underscore one fact that is both critical to the forthcoming legal analysis and constituted the crux of the parties' dispute at trial.

This Court finds that in 1998, in exchange for Jim's promise to assume responsibility for the trust property expenses, Drake agreed to name himself and Jim as joint tenants of the land trust's undivided beneficial interest ***and*** agreed to refrain from severing the joint tenancy, thereby preserving Jim's right of survivorship and creating the expectation that Jim would become the land trust's sole beneficiary if he outlived his father. The principal evidence in support of this finding was Jim's testimony, which this Court found to be credible.

Jean sees it differently. In her view, Drake's bargain with Jim included no more than his promise to assign Jim an equal share of the land trust's beneficial interest. She claims that Drake fulfilled that promise in 1998 by creating the joint tenancy and thereafter no further obligation of Drake's remained. Therefore, she says, Drake did not contravene his and Jim's agreement when he severed the joint tenancy and effectively extinguished Jim's right of survivorship by assigning his interest to her in 2008. But Jean admitted at trial that she did not know the terms of Drake and Jim's agreement, and in any case, whatever impression she had of it was at best second-hand. For this reason, Jean's view of the agreement has little probative value.

Jean argues that the land trust agreement supports her understanding of Drake and Jim's agreement. She highlights the fact that the 1977 trust agreement expressly authorizes assignment of any beneficial interest, and because the 1998 assignment that created Drake and Jim's joint tenancy did not add any restrictions on further assignment, a restraint on severance contradicts the written trust agreement and therefore could not have been a part of their deal. But the 1998 assignment also lacked a merger clause. And under Illinois law, joint tenants may orally agree not to sever a joint tenancy. *See Wisniewski v. Shimashus*, 22 Ill. 2d 451, 458, 176 N.E.2d 781, 785 (1961) ("[O]ral agreements may be made and can be enforced to prevent or remedy an act of severance by a joint tenant breaching such agreement . . . ."). That is what happened here.

Jean also argues that Jim's continued payment of the trust property expenses after Drake assigned her his interest belies the notion that the execution of her assignment breached Drake and Jim's agreement. If indeed it was a breach, she reasons, Jim would have ceased performing his side of the deal. Jim's explanation is that he continued performing because he thought Jean's assignment was legally unenforceable and therefore it did not in actuality sever his joint tenancy. Jean contends that Jim's explanation is disingenuous because he abandoned his invalidity claim

prior to trial—ergo, he has accepted the validity of her assignment. But by waiving a legal argument, one does not automatically concede its factual predicate. Thus, the credibility of Jim's stated belief in the unenforceability of Jean's assignment does not turn on whether he pursues legal action to void it. And such belief, which, again, this Court finds credible, reasonably explains why Jim continued paying the trust property expenses pursuant to an agreement that Drake otherwise breached.

Simple economics cast further doubt on Jean's contention that Drake agreed not to impair Jim's right of survivorship. In 1998, by the time Drake executed Jim's assignment, two mortgages had been secured by the land trust for a total of $550,000. Yet based on a 1993 appraisal, the trust property was only worth $500,000. So, in 1998, the value of Jim's half interest in the trust property—assuming Drake and Jim had decided to sell it—was worth only about half of the total mortgage liens attached to it. It seems unlikely, then, that Jim would have agreed to assume full responsibility for both mortgage payments (not to mention all other property expenses) without assurance that his interest in the property would one day (assuming he outlived his father) increase commensurately with the financial obligations he agreed to incur.

Further, it strains credulity to believe that Jim agreed with Drake to pay the trust property expenses in perpetuity despite not knowing whether Drake would remain his cotenant or who Drake might choose as his successor. In this regard, it bears particular not that Drake was well into his senior years by 1998 (he was seventy-seven), and he had just married a much younger woman two years earlier. Given this, it is hard to imagine that the succession of Drake's property interests was not a salient concern. When Drake agreed to create the joint tenancy with Jim, had he and Jim not been contemplating Drake's succession, Drake could have just as easily assigned half of his interest to Jim as tenants in common. Such as it was, Drake's assignment to Jim

expressly transferred his interests "not as tenants in common but in joint tenancy"—an expression, which by statutory design, serves the sole purpose of establishing a right of survivorship. *See* 765 Ill. Comp. Stat. 1005/1.

Turning lastly to the matters relevant for accounting, the parties have stipulated that the trust property's total residential rental income from November 2017 through February 2023 is equal to $192,000. By stipulation or through exhibits admitted at trial, this Court also finds the below trust property expenses were paid, either personally or on behalf of Leoris & Cohen, by Jim and without contribution from Drake or Jean. The depicted time periods are delimited by Jim's assignment in 1998, Jean's assignment in 2008, and Jean's demand in 2017.

| | 1998 to 2008 | 2008 to 2017 | | 2017 to 2023 | |
|---|---|---|---|---|---|
| | Jim | Jim | Leoris & Cohen | Jim | Leoris & Cohen |
| 1993 Note Payments | $404,296.02 | – | – | – | – |
| 1997 Note Payments | – | – | $128,416.32 | – | $84,411.81 |
| Real Estate Taxes | $79,482.69 | $83,668.49 | $109,424.10 | $15,432.74 | $112,459.71 |
| Property Insurance | – | – | $11,949.00 | – | $17,960.00 |
| Land Trust Fees | $2,175.00 | $2,200.00 | – | $1,695.00 | $335.00 |
| Miscellaneous Expenses | – | $2,919.86 | – | $8,826.79 | – |
| SUBTOTAL | – | $88,788.35 | $249,789.42 | $25,954.53 | $215,166.52 |
| TOTAL | $485,953.71 | $338,577.77 | | $241,121.05 | |

## CONCLUSIONS OF LAW

As a preliminary matter, Jean's assignment shall be declared valid. Before trial, Jim waived his argument to the contrary, therefore judgment will be entered for Jean on Count I of her counterclaim.

What remains is the claim for accounting. In essence, Jim seeks reimbursement for half of all trust property expenses he has paid since Drake's assignment to him in 1998 of an undivided beneficial interest in the land trust. For her part, Jean seeks half of all the residential rents Jim has collected since November 2017, the month after Drake's passing, and—based on Leoris & Cohen's rent-free use of the trust property's commercial office space—half of the trust property's commercial rental value since 2008. She also requests a partition of the party.

Before addressing the substance of their arguments, the Court notes that both parties invoke inapt legal doctrines to support their positions. Jim relies on section 4a of Illinois' Joint Tenancy Act to support a statutory right to damages. Section 4a states that "[w]hen one or more joint tenants, tenants in common or co-partners in real estate, or any interest therein, shall take and use the profits or benefits thereof, in greater proportion than his or their interest, such person or persons, . . . shall account therefor to his or their cotenants jointly or severally." 765 Ill. Comp. Stat. 1005/4a. Thus, by its plain terms, section 4a only deals with the disproportionate allocation of "profits or benefits" between cotenants. It has nothing to do with property expenses. Jim's claim based on his unequal assumption of property expenses, then, is not a claim for accounting but one for contribution. And under Illinois common law, a claim for contribution arises in equity. *Carlyle v. Jaskiewicz*, 124 Ill. App. 3d 487, 495, 464 N.E.2d 751, 757 (1984). Consequently, Jim cannot seek **as damages** his payments of Drake's proportionate share of the property expenses. Instead, to the extent that Jim's claim for contribution towards property expenses exceeds any property profits he unduly retained, Jim's remedy is limited to an equitable lien against Jean's share of the proceeds from any future sale of the trust property. *Id.*; *Sterling Sav. & Loan Ass'n v. Schultz*, 71 Ill. App. 2d 94, 103, 218 N.E.2d 53, 58 (1966). As it turns out,

however, this is not an issue—Jim's claim for contribution against Jean is less than he owes Jean for her share of the rental income generated by the trust property.

As for Jean, she styles her claim to her share of the trust property profits as a claim for conversion. This is an odd choice given that the substance of her claim falls squarely within section 4a's black-letter definition of an accounting. This Court construes her claim accordingly.

Jean's reliance on the law of conversion is potentially driven by her hope for punitive damages, but she identifies no Illinois case applying a conversion claim to the beneficial interest in a land trust.[4] This Court cannot identify any either, and for an elementary reason: a claim for conversion requires, among other things, "an absolute and unconditional right to the immediate possession of property . . . ." *Cirrincione v. Johnson*, 184 Ill. 2d 109, 114, 703 N.E.2d 67, 70 (1998). Simply put, a cotenant's right to property is not absolute and unconditional because it is subject to the rights of other cotenants. In other words, Jim cannot be liable for conversion of property he owns.

Jean's request for partition is also misguided. She asks for a judicial sale of the trust property, a disposition that is a typical remedy for disputes between cotenants of real property. A fundamental feature of Illinois land trusts, however, is that beneficiaries own their interests as personal property, whereas the trustee holds both legal and equitable title to the land trust's real property. *First Options of Chi., Inc. v. Stellings*, 215 Ill. App. 3d 1093, 1099, 576 N.E.2d 103, 107 (1991). For this reason, beneficiaries are generally not entitled to partition. *Id*.

Jim and Jean's land trust is no exception: the 1977 trust agreement expressly designates their beneficial interest as personal property. It also requires the trustee—upon expiration of the

---

[4] Jean also identifies no Illinois case allowing for punitive damages in an action for accounting. Further, the conduct at issue here does not come close to warranting an award of punitive damages. Jean's request for punitive damages is therefore rejected.

trust agreement—to sell any property remaining within the land trust. The parties have stipulated that their land trust expired in December 2017. Hence, unless Jim and Jean jointly direct the trustee to extend the trust agreement, the trustee will be duty bound to sell the trust property within a reasonable time following the conclusion of this suit. *Breen v. Breen*, 411 Ill. 206, 212, 103 N.E.2d 625, 628 (1952). And until a party brings suit claiming the trustee is derelict in that duty, this Court has no role to play in the sale. *Id.*; *Heritage Cnty. Bank & Tr. Co. v. State Bank of Hammond*, 198 Ill. App. 3d 1092, 1096, 556 N.E.2d 747, 750 (1990). There is no basis here, then, on which the Court may order partition of the property.

## I. <u>Accounting</u>

There are two components to Jean's claim for an accounting. First, she claims her share (half) of all residential rents Jim has collected since November 2017. Second, she claims half of the total fair rental value of the trust property's commercial office space based on Leoris & Cohen's uninterrupted, rent-free use of that space from 2008 to the present.

Regarding residential rents, her counterclaim originally sought half of all residential rents collected from 2008 onward. At trial, however, Jean waived any claim to the rents that Jim collected and remitted to Drake prior to Drake's passing in October 2017. Tr. 130:7-23, ECF No. 130. Given the validity of Jean's assignment, Jim also no longer contests that Jean is owed fifty percent of the trust property's residential rental income from November 2017 onward. The parties have stipulated that such income totals $192,000 through February 2023. Hence, Jean is entitled to $96,000.

Commercial rent is a different matter. Ever since Jean obtained an interest in the trust property, Jim has allowed his law firm, Leoris & Cohen, to occupy the property's commercial office space. Leoris & Cohen, however, has never paid rent. For this reason, Jean feels she is

entitled to half of the fair rental value of the commercial office space throughout the relevant tenure of Leoris & Cohen's occupancy. She is not.

Illinois' Joint Tenancy Act dictates that whenever one or more cotenants "take and use the profits or benefits" of any interest "in real estate . . . in greater proportion than his or their interest, such person or persons, . . . shall account therefor to his or their cotenants jointly or severally." 765 Ill. Comp. Stat. 1005/4a. This rule applies to co-beneficiaries of land trusts. *Sajdak v. Sajdak*, 224 Ill. App. 3d 481, 490, 586 N.E.2d 716, 723 (1992).

The Act's use of the verb *take* has significance. *See Vedam v. Reddi*, 2013 IL App (1st) 113803-U, ¶¶ 23–24 (examining and emphasizing section 4a). An occupying cotenant has no obligation under the Act to account for his or her actual or constructive use and occupancy of shared property when such cotenant does not "usurp" or "oust" another cotenant from the right to occupy the same. *Id.* ¶¶ 7, 23; *see id.* ¶ 14 ("[P]laintiff cannot sensibly be charged rent for using property plaintiff himself owns."). In other words, "[i]n order to render one cotenant liable to another cotenant for the rent or use of jointly owned property, there must be something more than mere occupancy of the property by one and forebearance from occupancy by another." *Clark v. Covington*, 107 Ill. App. 3d 845, 847, 438 N.E.2d 628, 629 (1982).

Jean's claim lacks "something more." She admitted at trial that she never attempted to use or occupy the trust property. Tr. 140:8–141:3, ECF No. 130. In fact, Jean did not assert any right to the trust property whatsoever until after Drake's passing in 2017. On October 31, 2017, Jean's attorney sent Jim a letter requesting Jean's share of the net rental proceeds. Jim promptly denied her request, citing his belief that her assignment was invalid. But even so, a refusal to remit trust property rental proceeds does not amount to an exclusion from the property.

13

Therefore, Jean is not entitled to rent based on Jim's use of the trust property's commercial office space.

## II. <u>Contribution</u>

"As a general proposition of the law of joint tenancy, cotenants are equally liable for the cost of necessary repairs as well as payment of the mortgage and real estate taxes." *Gilmore v. Gilmore*, 28 Ill. App. 3d 36, 40, 328 N.E.2d 562, 565 (1975). It is also clear that, "where one cotenant is in sole though non-adverse possession of the entire premises, the cotenant out of possession is nevertheless liable for his fractional share of payments of mortgage principal or payments of the value of capital improvement or of the cost of necessary repairs; and where the cotenant in possession has made the whole of such payments, he can enforce the liability of the cotenant out of possession, at least on final accounting between the cotenants when the cotenancy has been terminated by voluntary or partition sale of the property." *Id.* at 40 n.1, 328 N.E.2d at 565 n.1.

Jim claims the above principle renders Jean liable for half of all trust property expenses he has paid since his assignment in 1998. Jean, however, did not become Jim's cotenant until 2008. The first question, then, is whether Jean, as Drake's assignee, must contribute toward expenses incurred during her assignor's period of tenancy (*i.e.*, between 1998 and 2008).

As a general matter, "an assignee is placed 'in the shoes of' his assignor; that is, that he acquires the same rights as his assignor, but can have no greater rights than the assignor." *Carlyle v. Jaskiewicz*, 124 Ill. App. 3d 487, 492, 464 N.E.2d 751, 755 (1984) (citations omitted). Likewise, an assignee steps into the shoes of his assignor with respect to his assignor's liability for contribution to other cotenants. *Id.* This rule, which otherwise seems "harsh" and "would seriously impair the value of an interest held in cotenancy," has a limiting principle designed to

protect innocent assignees. *Id.* at 492–93, 464 N.E.2d at 756. That is, "a *bona fide* purchaser without notice of existing equities," but only such purchaser, "takes his interest free of any equitable claims for contribution which arose prior to the assignment." *Id*.

Relying on *Carlyle*, Jim argues that Jean is liable for contribution to the expenses he paid during Drake's period of tenancy because she was not a *bona fide* purchaser without notice of existing equities. And, indeed, Jean makes no attempt to argue that she was. Nevertheless, the rule in *Carlyle* only applies to claims for contribution which arose prior to an assignment. And claims for contribution only arise "due to the ***compulsory*** payment by a joint obligor of more than his share of a common obligation." *Ruggio v. Ditkowsky*, 147 Ill. App. 3d 638, 642, 498 N.E.2d 747, 750 (1986) (emphasis added). Here, this Court has found—consistent with Jim's testimony at trial—that Jim paid the entirety of the trust property expenses pursuant to an oral agreement he and Drake formed in 1998. Jim's knowing and voluntary entry into that agreement was, by definition, not compulsory. So, when Drake breached the agreement in 2008 by assigning his interest to Jean (thereby extinguishing Jim's agreed-to right of survivorship), Jim did not have a claim for contribution against Drake. Instead, Jim's claim for his prior, disproportionate payment of the trust property expenses arose under contract as a claim for breach. *Cf. In re Marriage of Adams*, 92 Ill. App. 3d 797, 805, 416 N.E.2d 316, 322 (1981) ("As a general proposition of the law of joint tenancy, cotenants are equally liable for the cost of necessary repairs as well as payment of the mortgage and real estate taxes. However, joint tenants may contract with each other concerning one joint tenant's right to exclusive possession or concerning responsibility for expenses."). The rule in *Carlyle* is therefore inapplicable, and Jim has provided no other explanation as to how Jean—simply because she is Drake's

assignee—can be held liable for Drake's breach of a contract to which she was not a party. Jim is not entitled to contribution for expenses he paid prior to Drake's assignment to Jean.

The next question is whether Jean is liable for contribution to the trust property expenses Jim paid after Drake assigned his interest in the property to her in 2008. Jean does not contest her liability for the expenses Jim paid after Drake's death in 2017, but she contests the rest.

Chiefly, Jean attempts to absolve herself of contribution liability by enforcing Drake and Jim's agreement. She argues that Drake and Jim's agreement required Jim to pay the trust property expenses, and as a third-party beneficiary to that agreement, she should not be made to contribute to the expenses that Jim promised to pay. But Jean most certainly was *not* an intended beneficiary of Drake and Jim's agreement—at least so far as Jim was concerned—and "Illinois courts recognize a strong presumption against conferring contractual benefits on noncontracting third parties. To overcome that presumption . . . [i]t is not enough to show that the parties know, expect, or even intend that others will benefit from the agreement. Instead, for a nonparty to qualify as a third-party beneficiary, the language of the contract must show that the contract was made for the direct, not merely incidental, benefit of the third person." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 639 (7th Cir. 2021) (internal quotation marks and citations omitted).

As a factual matter, moreover, the Court has rejected Jean's contention that Drake and Jim's agreement did not require Drake to preserve Jim's right of survivorship. Instead, this Court has found that Drake's severance of his joint tenancy with Jim constituted a material breach. Hence, in 2008, Drake's assignment to Jean excused Jim from his assumption of the trust property expenses and terminated Drake and Jim's agreement. In other words, there is no longer any agreement between Drake and Jim for Jean to enforce even if she qualified as a third party beneficiary.

16

In the alternative, Jean argues that Jim waived his right to contribution for the expenses paid between 2008 and 2017 because he knowingly continued paying those expenses despite Drake's breach. "Analysis of the applicability of waiver focuses on the intent of the non-breaching party." *Saverslak v. Davis-Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir. 1979). "In a contractual setting, . . . waiver occurs when an obligor manifests an intent not to require an obligee to strictly comply with a contractual duty." *Id*.

In the Court's view, this is a close question, but under the circumstances here, it cannot be said that Jim manifested an intent to excuse Drake from his promise not to sever the joint tenancy. Jim's post-2008 payments may only connote such intent if Jim understood at that time that the 2008 assignment constituted a breach. But given Jim's credible (albeit, erroneous) belief that Jean's assignment was invalid—a belief initially supported by the fact that Jean waited over nine years to assert any rights with regard to the property—it cannot be presumed that Jim understood that Drake had actually severed the joint tenancy. What is more, ***someone*** had to keep paying the trust property expenses regardless of whether Drake breached his agreement with Jim, and as Jim pointed out in his testimony, he needed to pay the expenses notwithstanding Drake's breach because his law firm was the borrower on the second mortgage loan and operated from the property. Thus, Jim's post-breach performance does not suffice to infer an intent to excuse Drake's breach.

Jean also argues that Jim is estopped from seeking contribution for the expenses paid between 2008 and 2017 because he continued remitting Jean's share of the residential rents to Drake during that time period. Estoppel, in contrast to waiver, focuses on the effect of an obligor's conduct rather than the obligor's intent. *Saverslak*, 606 F.2d at 213. "An estoppel[] . . .

arises only when a party's conduct misleads another to believe that a right will not be enforced and causes him to act to his detriment in reliance upon this belief." *Id*.

The right in question here is Jim's right to seek contribution for property expenses from Jean. The conduct in question is Jim's continued remittance of rents to Drake following Drake's assignment to Jean. This Court strains to see how the latter misled Jean to believe Jim would not enforce the former.

Jean explains that Jim's continued remittance to Drake "lulled [her] into believing that Drake and Jim had their own agreement," therefore "she did not make any demand for rent while Drake was alive or otherwise exercise her interest because she 'did not want to step on anybody's toes.'" Def.'s Post-Trial Br. 8, ECF No. 98 (quoting Tr. 130:21-23, ECF No. 130). So by Jean's account, it was her perception of Drake and Jim's agreement, not Jim's conduct, which led her to believe Jim would not seek contribution. True, Jim's conduct may have influenced Jean's perception of the agreement, but such link is far too specious to warrant estoppel, particularly because Jean admitted she did not know whether Drake and Jim's agreement had anything to do with the trust property expenses. *See* Tr. 141:21–142:3, ECF No. 130 ("*Q*: To be clear, you [Jean] don't know what Drake and Jim's agreement was, do you? *A*: I really don't."); *see also Town & Country Bank of Springfield v. James M. Canfield Contracting Co.*, 55 Ill. App. 3d 91, 95, 370 N.E.2d 630, 633 (1977) ("A party claiming the benefit of an estoppel cannot . . . neglect to seek information that is easily accessible[] and then charge his ignorance to others." (quotation omitted)). This Court also finds it particularly inequitable to estop Jim from asserting a right against Jean based on a benefit paid to Drake, some portion of which, in all likelihood, inured indirectly to Jean's benefit as well.

Finally, Jean argues that even if she is liable for contribution to expenses paid after her assignment in 2008, Jim cannot seek contribution for the portion of those expenses which were paid by Leoris & Cohen. This Court has found that Leoris & Cohen was the nominal payor for roughly eighty percent of the post-2008 expenses for which Jim seeks contribution (*i.e.*, $464,956 of $579,699).

Jean does not dispute that Leoris & Cohen is Jim's alter ego, nor does she identify any procedural improprieties with applying that doctrine at this stage. Jean simply points to *Trossman v. Philipsborn* for the proposition that payments made by a corporation may not be attributed to individual shareholders for the purposes of contribution because corporations and shareholders are distinct legal entities. 373 Ill. App. 3d 1020, 1048, 869 N.E.2d 1147, 1170 (2007).

*Trossman* is instructive, especially its treatment of corporate veil piercing under Illinois law. Corporate veil piercing is an equitable remedy allowing courts to disregard the corporate form when necessary to prevent injustice. *In re Rehab. of Centaur Ins. Co.*, 158 Ill. 2d 166, 173, 632 N.E.2d 1015, 1017–18 (1994). In Illinois, as elsewhere, the doctrine is expressed in a variety of forms. *See In re Wolf*, 644 B.R. 725, 748–51 (N.D. Ill. 2022) (discussing variations of veil piercing under Illinois law). The form relevant here is what is known as inside reverse veil piercing. "'Inside reverse veil piercing' involves a controlling insider who attempts . . . to disregard the corporate form of which he or she is a part." 1 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Corporations § 41.70 (rev. vol. 2022).

In *Trossman*, limited partners agreed with a bank to jointly and severally guarantee their partnership's loan obligations. 373 Ill. App. 3d at 1023–24, 869 N.E.2d at 1150–51. Contemporaneously with that agreement, the partners entered into an agreement among

themselves to contribute—in proportion to their ownership interests in the partnership—to any guaranty payment made by any partner. *Id*. One partner (Trossman) ultimately brought suit for profits distribution against two other partners (the "counterplaintiffs") who in turn claimed contribution for payments their company (The Philipsborn Company or "TPC") made in satisfaction of their joint guaranty. *Id*.

Relying on the "well-established doctrine of the separateness of the shareholders from the corporation," the *Trossman* court held that "the payments made by TPC may not be imputed to counterplaintiffs for the purpose of triggering the right to contribution." *Id.* at 1049, 869 N.E.2d at 1171. In so holding, the *Trossman* court rejected the counterplaintiffs' invocation of inside reverse veil piercing. It first acknowledged that previous Illinois courts have "recognized the fairness of allowing an 'insider' to pierce the corporate veil from within the corporation under appropriate circumstances . . . ." *Id.* at 1050, 869 N.E.2d at 1171 (citing *Crum v. Krol*, 99 Ill. App. 3d 651, 662, 425 N.E.2d 1081, 1089 (1981)). It went on, however, to interpret two subsequent Illinois Supreme Court decisions as categorically repudiating any "use of reverse piercing from within to benefit the corporate subsidiary or the corporate shareholders." *Trossman*, 373 Ill. App. 3d at 1052, 869 N.E.2d at 1173 (citing *Centaur*, 158 Ill. 2d at 173–74, 632 N.E.2d at 1018, and *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 297–98, 864 N.E.2d 227, 241 (2007)).

This Court has doubts as to whether *Centaur* and *Forsyth* sweep as broadly as the *Trossman* court understood. *See Wolf*, 644 B.R. at 750–51 (distinguishing *Crum* from *Centaur* and *Forsyth*). Nonetheless, *Trossman* is analogous to this case, and Jim has not provided any argument as to why this Court should decline to follow *Trossman* or permit him to pierce Leoris & Cohen's corporate veil as the law firm's sole shareholder. In accordance with *Trossman*, then,

this Court holds that the trust property expenses paid by Leoris & Cohen may not be attributable to Jim for the purposes of establishing the expense contribution due from Jean.

\*     \*     \*

In sum, (1) the 2008 assignment of Drake's beneficial interest in the land trust to Jean is valid; (2) the terms of trust agreement shall govern disposition of the trust property; (3) Jim is liable to account to Jean for half of all trust property rental proceeds collected between November 2017 and February 2023 ($96,000); and (4) Jean is liable for contribution to Jim for half of all trust property expenses that Jim personally paid from 2008 onward ($57,371). Netting these obligations leaves a balance owed by Jim to Jean of $38,629. Judgment will therefore be entered for Jean in that amount.

Date: September 28, 2023

John J. Tharp, Jr.
United States District Judge